**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

Meisam Sedighi,

Plaintiff,

v.

Affiliated Engineers Incorporated, et al.,

Defendants.

No. CV-25-04861-PHX-DWL

**ORDER**

Meisam Sedighi ("Plaintiff"), who is proceeding *pro se*, alleges that Affiliated Engineers Incorporated ("AEI") and one of its employees, Steve Yanke ("Yanke") (together, "Defendants"), discriminated against him and wrongfully terminated him "despite his valid work authorization under federal immigration law." (Doc. 1 at 7.)

Now pending before the Court is Defendants' motion to dismiss. (Doc. 9.) For the reasons that follow, the motion is granted in part and denied in part.

**BACKGROUND**

I. Relevant Factual Background

The following factual allegations, presumed true, are derived from the complaint and exhibits attached thereto unless otherwise noted. (Doc. 1.)[1]

A. **The Parties**

"Plaintiff . . . is a lawful non-U.S. citizen residing in Phoenix, Arizona." (*Id.* at 8.)

[1] "A court may . . . consider certain materials" including "documents attached to the complaint . . . without converting the motion to dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

Plaintiff "possessed valid CPT work authorization at all relevant times." (*Id.*)[2] Plaintiff is of "Iranian national origin." (*Id.* at 12.)

AEI "is a Wisconsin corporation authorized to do business and maintaining an office in Phoenix Arizona, employing more than 1,000 employees throughout the United States." (*Id.* at 8.)

Yanke is a "[p]rincipal" of AEI and the individual who terminated Plaintiff's employment at AEI. (*Id.* at 2, 10.)[3]

### B. Plaintiff's Hiring And Employment With AEI

In or before September 2024, "[a]t the time of [his employment] interview, [P]laintiff was under the assumption that his H-1B petition ha[d] been approved which w[ould] be starting Oct 01, 2024 and he also notified [AEI] that in the meantime that H-1B kicks in, he will be authorized to work through the CPT from school, Westcliff University." (*Id.* at 8. *See also* Doc. 1-1 at 1-3, 6-9.) "Plaintiff at the time of interview and negotiations with [AEI] did not possess his I-797 Approval Notice for his H-1B visa." (Doc. 1 at 8.) "The only document that he had was I-129 Receipt Notice which was approved by his previous employer paralegal Sayra Espinoza" ("Espinoza"). (*Id.* *See also* Doc. 1-1 at 42-46.)

On September 9, 2024, Plaintiff was issued an offer letter by AEI. (Doc. 1-1 at 4-5.) The offer letter was signed by Yanke. (*Id.* at 5.) The offer letter provides:

> This offer is contingent on your presenting documents to support your authorization to work. Pursuant to the Immigration and Nationality Act, AEI is required to verify the identity and employment authorization of all new hires. In compliance with this legal obligation, we must complete an Employment Eligibility Verification Form 1-9 within three days of hire. We

---

[2] "Curricular Practical Training (CPT) is defined as 'alternative work/study, internship, cooperative education, or any other type of required internship or practicum which is offered by sponsoring employers through cooperative agreements with the school.'" (Doc. 1-1 at 6, emphasis omitted.) "An F-1 student may be authorized by the DSO to participate in a [CPT] program that is 'an integral part of an established curriculum and/or is directly related to the student's major area of study.' 'A student may begin [CPT] only after receiving his or her Form I-20 with the P/DSO endorsement.'" (*Id.*, citing 8 C.F.R. § 214.2(f)(10)(i).)

[3] The complaint sometimes refers to "Yanke" as "Yanki." Because Plaintiff's offer letter from AEI was signed by "Yanke," the Court will use that spelling.

> have enclosed a Form I-9 and its acceptable document requirements for your review. Please note that you will need to provide either one document from "List A" or one document from "List B" and "List C" of the form (see page two of the enclosed I-9 form). If you anticipate having difficulty completing the Form I-9 or producing the required documents, please contact me immediately.

(Doc. 1 at 8-9; Doc. 1-1 at 4-5.)

The U.S. Citizenship and Immigration Services website provides that "[a] student participating in CPT may choose to present a List B and List C document instead of a List A document. For example, a state driver's license (List B document and, under List C #7, a Form I-94 indicating F-1 nonimmigrant status with a properly endorsed Form I-20." (Doc. 1 at 9; Doc. 1-1 at 35.) Plaintiff "provided . . . his driver's license, I-94 form, and endorsed I-20 for AEI employment." (Doc. 1 at 9.) "Plaintiff was never informed that his documentation was invalid or insufficient and was not asked to correct any alleged deficiency in his CPT-based authorization." (*Id.*) Plaintiff's endorsed Form I-20 reflected that his H-1B petition had a status of "approved" with a "benefit start date" of October 1, 2024 and a receipt number of IOE0926562688. (*Id.*; Doc. 1-1 at 48.)

On September 12, 2024, Anna Distefano ("Distefano") asked Plaintiff to "provide a copy of [his] H-1B approval notice" because AEI wanted to "initiate the H-1B transfer petition." (Doc. 1-1 at 2.)

On September 16, 2024, "Plaintiff began employment with AEI as a Senior Electrical Engineer." (Doc. 1 at 8. *See also* Doc. 1-1 at 5 [offer letter providing start date].)

That same day, Elizabeth Spencer ("Spencer"), associate counsel for AEI, emailed Plaintiff, stating that AEI would "need to get [his] H-1B transferred over to AEI as soon as possible" and asked Plaintiff to provide a "copy of [his] H-1B approval notice." (Doc. 1-1 at 10.) "Plaintiff was not aware of the H-1B transfer process as the AEI attorneys were asking for the H-1B approval notice" and "he did not possess that." (Doc. 1 at 9.) Plaintiff responded to Spencer that he was "trying to provide [AEI] with an updated i-20" and would "have to touch base with [his prior employer's] attorney regarding the h1-b." (Doc. 1-1 at 10.)

On September 17, 2024, Plaintiff emailed Spencer asking if she "believe[d] [AEI] [could] start the green card process." (*Id.* at 11.)

On September 18, 2024, Spencer responded that "AEI proceeds with green card processes on a case-by-case basis, typically after an employee has been with the firm for at least 1 year, to ensure that the position is a good fit." (*Id.*) Spencer "recommend[ed] speaking with [Plaintiff's] manager about [his] future plans and whether the green card process makes sense for [him]" "[o]nce [he] ha[d] been onboarded." (*Id.*) Additionally, Spencer stated that AEI was "still waiting on the copy of [Plaintiff's] H-1B approval." (*Id.*) Spencer explained that "[g]etting this status transfer is a time-sensitive process" and asked Plaintiff to "keep [her] updated on [his] correspondence with [his] attorney." (*Id.*)

That same day, Plaintiff responded, stating that "[t]he information regarding the H1-B approval was included in the i-20" and asking "if that [was] the information that [AEI] need[ed]." (*Id.*) "Regarding the green card process," Plaintiff explained that he "was already in the green card process and since it can be transferred over, [he] [was] assuming [AEI] [was] starting the process right away to catch up with [his] previous application." (*Id.*)

A few hours later, Spencer responded. (*Id.*) "Regarding the H1-B approval," Spencer explained that AEI was "specifically seeking the I-797 Approval Notice" and that "[t]he document [Plaintiff] previously sent [was] not that notice." (*Id.* at 12.) Additionally, Spencer explained that "[t]he PERM/Green Card process is a very serious commitment from both employer and employee" and that, "[a]s discussed . . . , the process is of significant expense and a time consuming," "[b]oth AEI and the employee need to be content that they are a good fit for each other," and "[a]s such, AEI only considers starting that process after 1 year of employment." (*Id.*) Spencer continued: "If the fact that AEI is unable to immediately start the PERM/Green Card process with you is an issue that may impact your decision to join AEI, please let us know as soon as possible." (*Id.*) Plaintiff responded, attaching "all [he] ha[d] regarding the H-1B document" and explaining that "[if] [AEI] need[ed] any further information or documents, [he would] have to connect

[AEI] with [his prior] company's attorney." (*Id.*) Spencer responded that AEI's outside immigration counsel, Carrie Ziegler Thomas ("Thomas"), would reach out to that attorney, and Plaintiff provided that attorney's contact information. (*Id.* at 12-13.)

Also on September 18, 2024, Plaintiff was asked by Haley Rishmawi ("Rishmawi"), who identified herself as working with Thomas, to complete an intake questionnaire "to prepare an H-1B petition for [his] employment with [AEI]." (*Id.* at 14.) On September 23, 2024, in response to Plaintiff's email that the questionnaire was "almost complete," Thomas informed Plaintiff that she was still waiting for, among other things, a copy of Plaintiff's "current I-797 H-1B approval notice." (*Id.* at 15.) Plaintiff responded that AEI would need to contact the attorney for his prior company to get the I-797 H-1B approval notice. (*Id.* at 16.) Thomas responded that she "did contact [Plaintiff's] prior attorney to request [his] I-797 approval notice" but the other attorney "ha[d] not responded." (*Id.*) Thomas suggested that the prior attorney "may not be able to send it to [her] for confidentiality reasons" and asked Plaintiff to "request [it] from [his] prior employer." (*Id.*) On September 24, 2024, Plaintiff responded and reiterated that he had "provided [AEI] with all the documents that [he] had," that he did "not have the I-797 approval notice," and that his I-20 form "shows the prequest[sic]/petition status as approved." (*Id.*)

"Plaintiff's attempt to provide the previous company, Farris Engineering, attorney's office was not successful, as AEI's attorney were not able to retrieve the approval notice from them." (Doc. 1 at 10.) "At the same time, [P]laintiff also could not communicate with his past employer attorney as he did not receive any answer." (*Id.* *See also id.* at 11 ["Plaintiff had no control over the H-1B visa transfer, and he did his best to provide the necessary documentation including approval notice to his AEI. However, his past employer did not want to involve with him anymore."].)[4]

Throughout his employment, Plaintiff's "performance was satisfactory." (*Id.* at 8.

[4] The U.S. Department of Labor's website provides information on the "portability provision" of the H-1B program, which "is intended to preserve the legal status of an H-1B nonimmigrant who is already in the United States." (Doc. 1-1 at 50.) "Portability allows the employed H-1B worker to enter into employment with a new employer provided that" certain requirements are met. (*Id.*)

*See also id.* at 12 [“Plaintiff was qualified for his position and performed his job satisfactorily.”]; *id.* [“[Plaintiff] is one of the most qualified people in the Phoenix office as he [sic] very positive feedback during his employment from his peers.”].)

C. **Plaintiff’s Termination**

On September 26, 2024, Yanke “called [Plaintiff] in the conference room . . . and told him you are terminated as you are not able to provide us with H-1B documents.” (*Id.* at 10 [“Yank[e]’s statement about the reason for termination was Plaintiff’s ‘inability to provide us with H-1B visa documents.’”].) “AEI’s decision did not reference Plaintiff’s CPT authorization, and AEI did not discuss or evaluate Plaintiff’s valid CPT work authorization during the termination conversation.” (*Id.*) “Plaintiff’s attempts to discuss the situation with [Yanke] was not successful as he was denying to meet and talk with [Plaintiff] during and shortly after their meeting in the conference room.” (*Id.*)

“Plaintiff possessed valid CPT work authorization on the date of termination and throughout his employment.” (*Id.* at 11.)

D. **Post-Termination Developments**

On September 27, 2024, Plaintiff emailed Thomas, cc’ing Rishmawi and Spencer, stating:

> It seems like there was some sort of miscommunication from my side regarding my work permit. The CPT work authorization allows working off campus full time for any employer. This document is from my current university which I already provided the i-20 with you.
>
> Regarding the H-1B visa, I am still trying to get an update from Farris Engineering, the petitioner of the visa. In the meantime, I have a valid F-1 visa with CPT work authorization. That is what I mentioned to Dana Thompson during the interview process.
>
> Please look into the attached document and let me know if you have any question and/or need any additional documents.

(Doc 1-1 at 16-17.) That same day, Plaintiff reached out to Espinoza asking for a copy of his I-797 H-1B approval notice. (*Id.* at 42.)

On September 30, 2024, Plaintiff went to the Omaha office of Farris Engineering’s attorneys to retrieve his approval notice. (Doc. 1 at 11. *See also* Doc. 1-1 at 20.) That

same day, Espinoza provided Plaintiff with the approval notice via email. (Doc. 1 at 11. *See also* Doc. 1-1 at 20-22.)

That same day, Plaintiff forwarded the approval notice to Thomas, Rishmawi, and Spencer, stating: "Please find attached a copy of approval notice, i-797. I just got it from the [prior] company's attorney. I had to go to their office to get a copy of it. I can provide you with all the documents that you asked for in your previous email. Please advise." (Doc. 1-1 at 17.) Spencer responded: "It is my understanding that your employment with AEI ended on September 26th, 2024. AEI's employment decision is final. You do not need to provide AEI with any further documentation related to your immigration status." (*Id.*)

Also on September 30, 2024, Michael Wallace of Farris Engineering explained to Plaintiff in an email that Plaintiff's "H1-B came through shortly after [Plaintiff] was let go" from Farris Engineering, but "once [Plaintiff] [was] no longer working for Farris Engineering," the H1-B visa was "no longer valid." (*Id.* at 23.) Wallace told Plaintiff that he "suspect[ed] the process would have to be started over with [Plaintiff's] new employer" but was "not sure of the process for them." (*Id.*) That same day, Stephanie Wright of Farris Engineering sent Plaintiff an email attaching "the Decision automatically revoking the I-129 Petition along with the requested I-797A." (*Id.*; *id.* at 25-30 [decision revoking the approval of the petition]. *See also* Doc. 1 at 11.)[5]

…

[5] Pursuant to Federal Rule of Evidence 201, Defendants ask the Court to take judicial notice of "USCIS Case Status records associated with Plaintiff's H-1B petition receipt number, reflecting that the petition was approved and subsequently revoked." (Doc. 10 at 1, 6. *See also* Doc. 9 at 4 & n.1.) Plaintiff objects, arguing that (1) Defendant's request is "procedurally improper" because Defendant did not include the request in its motion to dismiss, and (2) the Court cannot take judicial notice of "Defendant's interpretation or draw disputed inferences from those records at the pleading stage." (Doc. 21 at 12-13.) Under Rule 201, the Court "may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately determined from sources whose accuracy cannot reasonably be questioned," and the Court "must take judicial notice if a party requests it and the court is supplied with the necessary information." *Id.* Plaintiff does not dispute the accuracy of the USCIS record reflecting that his H-1B petition was revoked, and indeed, the complaint and documents attached thereto indicate that Plaintiff's H-1B petition was revoked. Accordingly, the Court takes judicial notice of the existence of the USCIS record and of the fact that Plaintiff's H-1B petition was approved and then revoked.

E. **Comparators And Pretext**

"Upon information and belief, employees in the Phoenix office who were not on student-visa status or did not require immigration documentation to work were *not required* to provide additional documents beyond the standard I-9 process and were not subjected to termination on the basis of immigration documentation." (Doc. 1 at 11.) "Plaintiff was the only employee terminated for failure to produce H-1B documentation despite holding valid work authorization under CPT." (*Id.*)

"Similarly situated employees outside Plaintiff's protected class were treated more favorably, including being permitted to complete the I-9 process without being required to produce additional immigration-specific documents and not being terminated on that basis," and "AEI's proffered reason of inability to produce H-1B documentation was pretextual and was based on bias relating to Plaintiff's national origin and immigration-related status." (*Id.* at 12.)

"Plaintiff is Iranian origin while still on F-1 visa status," his "termination roots into his nationality and bias in decision making at the time of termination," and "[i]t is believed that other people in the Phoenix office who were not Iranian origin, did not experience any adverse employment action including termination." (*Id.*)

"It is believed that other people in the Phoenix office who were not on visa did not experience any adverse employment action including termination." (*Id.* at 13.)

F. **EEOC**

"Plaintiff . . . filed an EEOC charge for employment discrimination. " (*Id.* at 11). On September 30, 2025, he was issued a notice of his right to sue. (Doc. 1-1 at 31-34.)

II. <u>Relevant Procedural Background</u>

On December 29, 2025, Plaintiff initiated this action. (Doc. 1.)

On February 27, 2026, Defendants filed the pending motion to dismiss the complaint. (Doc. 9.) The motion to dismiss is now fully briefed. (Docs. 21, 22.)[6]

---

[6] Plaintiff's request for oral argument is denied because the issues are fully briefed and argument would not aid the decisional process. *See* LRCiv 7.2(f).

Also on February 27, 2026, Defendants filed a request for judicial notice. (Doc. 10.)

On May 10, 2026, Plaintiff filed a motion for leave to file a surreply (Doc. 23), which Defendants opposed (Doc. 24) and the Court denied (Doc. 25).

On June 10, 2026, Plaintiff filed a motion for reconsideration (Doc. 26), which the Court denied (Doc. 27).

**DISCUSSION**

I. Legal Standard

Under Rule 12(b)(6), "to survive a motion to dismiss, a party must allege sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (cleaned up). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." *Id.* at 1144-45 (citation omitted). However, the Court need not accept legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678-80. Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. The court also may dismiss due to "a lack of a cognizable legal theory." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

II. Counts One And Two

In Counts One and Two, Plaintiff asserts claims for discrimination under Title VII and 42 U.S.C. § 1981, respectively. (Doc. 1 at 12.) Plaintiff alleges he was subjected to discrimination on two distinct grounds: first, his national origin; and second, his immigration status. (*Id.* ["AEI's proffered reason . . . was based on bias relating to Plaintiff's national origin and immigration-related status."]. *See also id.* at 4 [on the Court's form complaint for use in employment discrimination cases, Plaintiff indicated that

the alleged discrimination was based both on "national origin" and "Immigration Status"].)

## A. **The Parties' Arguments**

Defendants argue that the complaint "attempts to recharacterize a lawful employment decision based on work-authorization constraints as unlawful discrimination," but "[a]s pleaded, and as confirmed by judicially noticeable USCIS records, Plaintiff's allegations fail to state a claim under Title VII." (Doc. 9 at 4, record citation omitted.) Defendants argue that "Plaintiff was hired based on his representation that he possessed valid H-1B work authorization that could be transferred to Defendant AEI"; that "[c]onsistent with federal law, AEI undertook efforts to pursue an H-1B transfer on Plaintiff's behalf"; and that "[t]hose efforts revealed, however, that Plaintiff's H-1B petition had been revoked, rendering any transfer legally impossible." (*Id.*) Defendants argue that "[p]ublicly available USCIS records associated with Plaintiff's H-1B receipt number . . . reflect that the petition was approved and subsequently revoked," and "[b]ecause a revoked H-1B cannot be transferred, Plaintiff's continued employment would have required sponsorship through a new H-1B petition subject to the statutory lottery, with no assurance of selection or work authorization," and "[t]his uncertainty rendered Plaintiff's prospective employment legally unstable." (*Id.* at 5.) Defendants argue that "[e]mployment decisions based on an employee's lack of lawful work authorization—or the impossibility of obtaining it—do not constitute discrimination under Title VII" because "[s]uch decisions are not based on national origin, but on compliance with federal immigration law." (*Id.*) Next, Defendants argue that "Plaintiff's effort to reframe these facts as discrimination fails as a matter of law" because "[t]he [c]omplaint contains no factual allegations plausibly suggesting that Defendants acted because of Plaintiff's national origin, as opposed to the absence of legally viable work authorization," and "[m]erely invoking the phrase 'national origin,' without factual content supporting that conclusion, is insufficient under *Twombly* and *Iqbal*." (*Id.*) Defendants argue that "Plaintiff's temporary CPT authorization did not alter this analysis" because "CPT is, by definition, short term, school based authorization with a fixed expiration and no guarantee

of extension, and therefore could not provide a lawful basis for Plaintiff's continued employment once his H-1B transfer proved legally impossible." (*Id.*) Defendants emphasize that "Title VII prohibits discrimination based on race, color, religion, sex, or national origin," but "[i]t does not prohibit discrimination based solely on citizenship or immigration status." (*Id.* at 6.) Defendants argue that "[w]here, as here, the [c]omplaint's factual allegations concern work-authorization constraints and compliance with federal immigration law, those allegations do not, without more, state a plausible claim of national origin discrimination," and "[a]bsent factual allegations plausibly suggesting that Defendants acted because of Plaintiff's national origin, Plaintiff's Title VII claim fails as a matter of law and should be dismissed with prejudice." (*Id.* at 7.)

In response, Plaintiff argues that the complaint "alleges that he possessed a valid CPT work authorization at the time of termination, that he properly completed the Form I-9 process, and that he was terminated solely because he could not produce H-1B approval documents"; that "Defendant[s] refused to recognize or evaluate his valid CPT authorization"; and that "[s]imilarly situated non-visa employees were not required to produce additional immigration documents." (Doc. 21 at 3.) Plaintiff argues that "[t]he termination decision was not based on a lack of work authorization" because "Plaintiff had valid authorization"—rather, "[t]he termination was based on Defendants' refusal to accept lawful CPT documentation and their insistence on additional immigration documentation not required under federal law." (*Id.*) Next, Plaintiff argues that communications from AEI "reflect[] that [AEI] conditioned Plaintiff's long-term employment prospects on discretionary immigration sponsorship, thereby treating Plaintiff differently based on his immigration-related status and future work authorization needs." (*Id.*) Plaintiff argues that the complaint "supports a plausible inference that Defendant[s] w[ere] unwilling to retain Plaintiff as a long-term employee due to his need for immigration sponsorship and w[ere] prepared to terminate or avoid continued employment on that basis" and that "[s]uch allegations are sufficient at the pleading stage to demonstrate discriminatory motive and pretext and therefore defeat dismissal under Rule 12(b)(6)." (*Id.* at 4.) Plaintiff also argues

that "Defendant[s'] characterization of [CPT] as merely 'temporary' and insufficient for continued employment is misleading and incomplete" because "federal regulations expressly authorize employment under CPT for the duration of the student's qualifying academic program, without imposing a fixed short-term limitation independent of that program." (*Id.*) Plaintiff contends that "federal employment eligibility law does not require a specific visa classification such as H-1B, but only that an employee possess valid work authorization" and that his "CPT authorization satisfied these requirements," so "Defendant[s'] assertion that Plaintiff was required to obtain H-1B status to remain employed improperly imposes a requirement not found in the governing statutes or regulations." (*Id.*) Plaintiff argues that "[a]t a minimum, whether CPT authorization was sufficient for continued employment presents a factual issue that cannot be resolved at the pleading stage and must be construed in Plaintiff's favor." (*Id.*) Next, Plaintiff argues that the complaint "does precisely what *Twombly* and *Iqbal* require—it provides specific factual allegations, including documented communications, adverse employment actions, and discriminatory treatment tied to Plaintiff's immigration-related status, from which a reasonable inference of liability can be drawn." (*Id.* at 5.) Next, Plaintiff argues that "Defendant[s'] assertion that Plaintiff's termination was based solely on work authorization issues is inaccurate and improperly reframes the facts" and that "Plaintiff's termination arose from Defendant[s'] failure to understand and properly evaluate lawful work authorization in the context of Plaintiff's national origin." (*Id.* at 6.) Specifically, Plaintiff argues that "[i]mmigration pathways and practical constraints are not applied uniformly across all individuals; rather they vary based on country-specific circumstances," and "[i]ndividuals from certain countries, including Iran, face distinct regulatory and practical limitations under U.S. immigration law." (*Id.*) Plaintiff argues that "Defendant[s'] treatment of Plaintiff's situation, including [their] assumptions and conclusions regarding his work authorization, supports a reasonable inference that national origin was a contributing factor." (*Id.*) Next, Plaintiff argues that "Defendant[s'] reliance on the revocation of Plaintiff's H-1B petition is misplaced" because "[t]here was no

requirement at the time of hiring—whether in the offer process or under the Form I-9 Employment Eligibility Verification—that Plaintiff possess or transfer an H-1B visa." (*Id.*) Plaintiff also argues that "[t]he H-1B revocation was an action taken by [his] prior employer and occurred without [his] consent or control," and "[a]s such, it cannot serve as a legitimate basis to attribute fault to Plaintiff or justify termination." (*Id.*) Next, Plaintiff argues that "Defendant[s] w[ere] not legally compelled to terminate Plaintiff" and that "Defendant[s] had multiple lawful options available, including continuing Plaintiff's employment under CPT authorization, sponsoring Plaintiff in a future H-1B lottery, or initiating a green card process." (*Id.* at 7.) Plaintiff argues that "Defendant[s'] decision not to pursue these options, combined with [their] correspondence reflecting reluctance to support long-term employment, demonstrates a discretionary employment decision" and "[e]mployment decisions based on discretionary considerations, rather than legal necessity, may give rise to discrimination claims." (*Id.* at 7.) Next, Plaintiff argues that he "is not required to establish a prima facie case" of Title VII discrimination "at the pleading stage, but only to allege sufficient facts to plausibly suggest that an adverse employment action was taken because of a protected characteristic" and that the complaint "satisfies this standard by alleging Defendant[s'] actions were influenced by Plaintiff's national origin and related immigration circumstances." (*Id.* at 8.) Plaintiff argues that "Defendant[s'] attempt to separate immigration status from national origin is overly rigid and ignores the factual context" and that "Title VII probits discrimination based on national origin, even where employment decisions are intertwined with citizenship or immigration-related considerations." (*Id.*) Plaintiff argues that the complaint's "allegations do not rely solely on citizenship or immigration status, but rather on how Defendant[s] treated Plaintiff differently due to his background, including misunderstandings and assumptions tied to his national origin" and that the allegations in the complaint "support a reasonable inference that Plaintiff's national origin was intertwined with Defendant's decision-making process." (*Id.*) Last, Plaintiff argues that he "has alleged non-conclusory facts linking the adverse employment action to discriminatory intent, including Defendant[s'] handling of Plaintiff's

work authorization, [their] failure to consider lawful alternatives, and [their] internal communications reflecting reluctance to support Plaintiff's long-term employment" and that "[a]t the pleading stage, these factual allegations must be accepted as true and construed in Plaintiff's favor." (*Id.* at 9.)

In reply, Defendants argue that "Plaintiff's Opposition confirms that this case is about work authorization, F-1 Student [CPT] versus H-1B worker sponsorship, and related immigration compliance—not actionable national-origin discrimination." (Doc. 22 at 2.) Defendants argue that "[e]ven in opposing dismissal, Plaintiff frames the dispute as whether Defendants were correct to require proof of continuing work authorization, whether CPT was sufficient, whether an H-1B transfer was necessary for continuing work authorization, and whether Defendants had lawful alternatives short of termination." (*Id.*) Defendants argue that "[t]hose are immigration-authorization disputes, not facts plausibly showing discrimination because of national origin." (*Id.*) Defendants also argue that "[m]erely invoking Plaintiff's country of origin does not bridge that gap" because "[t]he Opposition still does not identify any nonconclusory allegations that, if taken as true, would show Defendants acted because Plaintiff was Iranian, as opposed to because of perceived or actual work-authorization issues." (*Id.*) Defendants emphasize that Plaintiff also does not "identify specific remarks, actions, comparators, or circumstances that plausibly tie the challenged employment decision to national origin rather than immigration compliance concerns." (*Id.*) Defendants argue that "[a]t most, Plaintiff alleges that Defendants were mistaken about the legal significance of his work authorization documents," "[b]ut an alleged mistake regarding employment authorization is not the same as national-origin discrimination." (*Id.*) Next, Defendants reiterate "that the challenged employment decision arose from Plaintiff's work-authorization situation, including the status of the H-1B petition filed by Plaintiff's former employer and the inability to proceed on the basis Plaintiff had represented." (*Id.* at 2-3.) Defendants argue that "Plaintiff does not directly rebut that point," and "[i]nstead, he argues that CPT was sufficient, that Defendants could have proceeded differently, and that Defendants should have accepted his interpretation of

his work authorization." (*Id.* at 3.) Defendants argue that Plaintiff's "response misses the point" because "[t]he issue is not whether Plaintiff now disputes Defendants' understanding of immigration law," "[t]he issue is whether the pleadings plausibly show discrimination." (*Id.*) Defendants argue that "[t]hey do not" because "Plaintiff's own Opposition confirms that Defendants acted based on concerns about authorization, sponsorship, and immigration compliance, including Plaintiff's failure to cooperate with Defendants to provide requested information to confirm his eligibility for H-1B transfer," and "[t]hose allegations undercut any inference that the decision was based on national origin." (*Id.*)

B. **Analysis**

1. <u>Title VII (Count One)</u>

Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To establish a *prima facie* case of national origin discrimination under Title VII, a plaintiff must show that: "(1) he belonged to a protected class; (2) he was qualified for his job; (3) he was subjected to an adverse employment action; and (4) similarly situated employees not in his protected class received more favorable treatment." *Kang v. U. Lim Am., Inc.*, 296 F.3d 810, 818 (9th Cir. 2002).[7] "[A]lthough plaintiffs do not have the burden of establishing a *prima facie* case at the pleading stage," "a plaintiff still must make

---

[7] *Kang* was decided under the *McDonnell Douglas* burden-shifting framework applicable to Title VII discrimination claims at the summary judgment stage. As this Court has previously recognized, the analysis of Title VII discrimination claims at the pleading stage is "governed by Rule 8, not the *McDonnell Douglas* framework." *Chandler v. DeJoy*, 2021 WL 673289, *13 (D. Ariz. 2021). Nevertheless, "although plaintiffs do not have the burden of establishing a *prima facie* case at the pleading stage, courts in the Ninth Circuit continue to review discrimination complaints under the *McDonnell Douglas* framework so as to decide, in light of judicial experience and common sense, whether the challenged complaint contains sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Id.* (cleaned up). *See also Albro v. Spencer*, 854 F. App'x 169, 169-70 (9th Cir. 2021) (applying *McDonnell Douglas* when evaluating Rule 12(b)(6) motion).

'sufficient, nonconclusory allegations' linking the challenged actions to discrimination." *Chandler,* 2021 WL 673289 at *13.

a. **National Origin Discrimination**

As noted, Plaintiff alleges he was subjected to discrimination on two grounds: first, his Iranian national origin; and second, his immigration status. (Doc. 1 at 4, 12.)

The first theory satisfies the first prong of the *prima facie* test for Title VII discrimination. *See, e.g.*, *Sarkis v. Yolo Cnty. Pub. Agency Risk Mgmt. Ins. Auth.*, 2022 WL 4133136, *3 (E.D. Cal. 2022), *report and recommendation adopted*, 2022 WL 4664622 (E.D. Cal. 2022) ("[P]laintiff alleges that he belongs to a protected class—'I (plaintiff) am an Iranian-born middle eastern American.'").

As for the second prong, Plaintiff alleges that he "was qualified for his position," "performed his job satisfactorily," "is one of the most qualified people in the Phoenix office," and received "very positive feedback during his employment from his peers." (Doc. 1 at 12.) Thus, he has sufficiently pleaded that he was qualified. *See, e.g.*, *Sumera v. Holder*, 2014 WL 3058278, *6 (N.D. Cal. 2014) (allegations that the plaintiff "was qualified," "was ably performing his job," "was recognized as having done the job without problem," and received a positive performance evaluation "sufficiently address Plaintiff's qualifications for his position").

As for the third prong, Plaintiff alleges he was terminated, which qualifies as an adverse employment action. *Cf. Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 970 (9th Cir. 2002) ("[O]f course, termination of employment is an adverse employment action . . . .").

Plaintiff's showing falters at the fourth prong, because the complaint fails to allege any facts to support that non-Iranians were treated more favorably than Plaintiff. At most, the complaint alleges, in conclusory fashion, that "[s]imilarly situated employees outside Plaintiff's protected class were treated more favorably" and that "[i]t is believed that other people in the Phoenix office who were not Iranian origin, did not experience any adverse employment action including termination." (Doc. 1 at 12.) But "a plaintiff . . . must make

'sufficient, nonconclusory allegations' linking the challenged actions to discrimination." *Chandler*, 2021 WL 673289 at *13. *See also Bekkem v. Wilkie*, 915 F.3d 1258, 1275 (10th Cir. 2019) ("[I]t is insufficient for a plaintiff to allege, for instance, that she did not receive an employment benefit that 'similarly situated' employees received. A plaintiff's assertion that she is 'similarly situated' to other employees is just a legal conclusion—and a legal conclusion is never enough.") (cleaned up); *Barrett v. Kaiser Found. Health Plan of Nw.*, 2015 WL 1491037, *3 (D. Or. 2015) (allegation "that Defendant treated one similarly situated non-African American employee, Mark Bennet, more favorably than Plaintiff 'under similar, or more egregious, circumstances' . . . provides no more than a conclusory assertion that Plaintiff and Mr. Bennett were similarly situated"). Plaintiff's conclusory assertion that non-Iranian employees were treated more favorably is insufficient.[8]

To be clear, "identification of a similarly situated comparator is only one way to establish discrimination." *Ruggles v. State*, 2025 WL 1745023, *8 (D. Ariz. 2025). "The fourth element can also be established via 'other circumstances surrounding the adverse employment action [that] give rise to an inference of discrimination.'" *Id.* (quoting *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1156 (9th Cir. 2010)). But the complaint contains no allegations suggesting that other circumstances surrounding Plaintiff's termination give rise to an inference that he was discriminated against based on his Iranian national origin. Instead, the allegations in the complaint indicate that he was terminated based on his immigration status—more specifically, his possession of one type of valid work authorization (CPT) rather than a different type of valid work authorization (H-1B visa). (Doc. 1 at 7 ["This is an action . . . arising from [Defendants'] termination of Plaintiff's employment . . . despite his valid work authorization under federal immigration law."]; *id.* at 10 [the reason given by Yanke "for termination was Plaintiff's 'inability to provide us

---

[8] Plaintiff brought a Title VII claim premised on national origin discrimination against his former employer, Farris Engineering, in the District of Nebraska. *Sedighi v. Farris Eng'g, Inc.*, 2025 WL 2879653, *1 (D. Neb. 2025). On October 9, 2025—before Plaintiff filed his complaint in this case—the Nebraska district court screened Plaintiff's complaint pursuant to 28 U.S.C. § 1915(e)(2) and held that "Plaintiff alleges he was treated differently than other similarly situated employees, but that statement is conclusory, and it is disregarded by the [c]ourt because it lacks any alleged supporting facts." *Id.* at *2.

with H-1B visa documents'"]; *id.* at 11 [alleging that other "employees in the Phoenix office . . . were not subjected to termination on the basis of immigration documentation" and that "Plaintiff was the only employee terminated for failure to produce H-1B documentation despite holding valid work authorization under CPT"]; *id.* at 11 [alleging that Defendants' "decision about termination was not based on any actual legal authorization, but on a misunderstanding, assumption, or bias concerning immigration status"]; *id.* at 12 [alleging that others "outside Plaintiff's protected class were treated more favorably, including being permitted to complete the I-9 process without being required to produce additional immigration-specific documents not being terminated on that basis"].) Plaintiff's response brief also seems to acknowledge that his claim is based on this distinction in immigration status. (*See, e.g.*, Doc. 21 at 3 ["Plaintiff's Complaint alleges that he possessed a valid CPT work authorization at the time of termination, that he properly completed the Form 1-9 process, and that he was terminated solely because he could not produce H-1B approval documents. Defendant[s] refused to recognize or evaluate his valid CPT authorization. Similarly situated non-visa employees were not required to produce additional immigration documents."]; *id.* at 3 [attaching communications with AEI and arguing that such "communication reflects that Defendant[s] conditioned Plaintiff's long-term employment prospects on discretionary immigration sponsorship, thereby treating Plaintiff differently based on his immigration-related status and future work authorization needs"]; *id.* at 5 ["Plaintiff's complaint . . . provides specific factual allegations, including . . . discriminatory treatment tied to Plaintiff's immigration-related status, from which a reasonable inference of liability can be drawn."].)

Notwithstanding all of this, Plaintiff argues that the complaint's "allegations do not rely solely on citizenship or immigration status, but rather on how Defendant treated Plaintiff differently due to his background, including misunderstandings and assumptions tied to his national origin." (*Id.* at 8.) Plaintiff further argues that "[i]mmigration pathways and employment authorization considerations are not applied uniformly across all

individuals, and individuals from certain countries, including Iran, face distinct challenges and scrutiny," and "[t]hese facts support a reasonable inference that Plaintiff's national origin was intertwined with Defendant[s'] decision-making process." (*Id.*) It is true that "there may be many situations where discrimination on the basis of citizenship would have the effect of discriminating on the basis of national origin." *Espinoza v. Farah Mfg. Co., Inc.*, 414 U.S. 86, 92 (1973).

> In some instances, for example, a citizenship requirement might be but one part of a wider scheme of unlawful national-origin discrimination. In other cases, an employer might use a citizenship test as a pretext to disguise what is in fact national-origin discrimination. Certainly Tit. VII prohibits discrimination on the basis of citizenship whenever it has the purpose or effect of discriminating on the basis of national origin. The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation.

*Id.* (cleaned up).

The problem for Plaintiff is that the complaint provides nothing more than the bare legal conclusion that Defendants' "proffered reason of inability to produce H-1B documentation was pretextual and was based on bias relating to Plaintiff's national origin and immigration-related status." (Doc. 1 at 12.) Missing are any non-conclusory factual allegations that support an inference of anti-Iranian bias. *See, e.g.*, *Espinoza*, 414 U.S. at 92 ("There is no indication in the record that Farah's policy against employment of aliens had the purpose or effect of discriminating against persons of Mexican national origin."); *Rai v. IBM Credit Corp.*, 2002 WL 1808741, *6 (N.D. Cal. 2002) ("[Plaintiff's] 'green card' claim is not actionable. To prove that defendant's green card policy had the purpose or effect of discriminating on the basis of national origin, plaintiff would have to show that defendant systematically discriminated against persons of Fijian-Indian decent, or that they generally discriminated against persons of foreign origin. However, Plaintiff's vague allegation that 'IBM's "green card" practice was widespread and had the purpose or effect of discriminating against Mr. Rai based on his national origin' is wholly speculative and lacks any factual foundation.") (citation omitted).

In short, because there are no non-conclusory allegations in the complaint connecting Plaintiff's Iranian national origin to his termination, the complaint fails to state a Title VII claim based on national origin discrimination.[9]

b. **Immigration Status Discrimination**

This leaves Plaintiff's remaining theory—that he was subjected to discrimination based on his immigration status. This theory requires little discussion in relation to Plaintiff's Title VII claim, as "nothing in [Title VII] makes it illegal to discriminate on the basis of citizenship or alienage." *Espinoza*, 414 U.S. at 95. *See also Cameron v. Bellevue Police Dep't*, 2024 WL 4592892, *6 (W.D. Wash. 2024) ("Because Mr. Cameron's discriminatory treatment theory is based on his non-U.S. citizenship or lack of permanent residency status, not his Canadian national origin, it is not actionable under Title VII."); *Prado v. Fed. Express Corp.*, 2014 WL 4648060, *2 (N.D. Cal. 2014) ("[F]or the purpose of a Title VII discrimination claim, 'national origin' does not include immigration status."); *Childs v. Microsoft Corp.*, 2011 WL 6330141, *4 (W.D. Wash. 2011), *aff'd*, 489 F. App'x 224 (9th Cir. 2012) ("Though Dr. Childs contends that he appreciates the difference between national origin and citizenship, and that his discrimination claims are based on national origin discrimination, his allegations and arguments do not support such a contention. Dr. Childs is not contending that he was adversely affected by Microsoft's relocation policies because of his national origin; he did not face repatriation due to his national origin, but based on his immigration status. The distinguishing characteristic of Dr. Childs' purported 'protected class' is therefore immigration status, and that characteristics is not protected by Title VI . . . ."); *Roche v. La Cie, Ltd.*, 2009 WL 4825419, *3 (D. Or. 2009) ("Mr. Roche presented direct evidence suggesting that La Cie paid him a lower salary because of his citizenship and immigration status. Without more, this evidence is insufficient to establish a Title VII claim because discrimination based on citizenship or alienage does not amount to a Title VII violation.").[10]

---

[9] This conclusion renders it unnecessary to address the parties' arguments regarding Title VII exhaustion requirements.

[10] As discussed, Plaintiff previously brought a Title VII claim premised on national

2. Section 1981 (Count Two)

a. **National Origin Discrimination**

To the extent Plaintiff's § 1981 claim in Count Two is brought under the theory that he was subjected to national origin discrimination, it fails because § 1981 does not cover national origin discrimination. *See, e.g.*, *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 850 (9th Cir. 2004) (noting that "national origin discrimination is not within the ambit of § 1981"); *Sedighi*, 2026 WL 554570 at *5 (dismissing Plaintiff's § 1981 against his former employer, Farris Engineering, because "§ 1981 prohibits racial discrimination" but "is not applicable to claims of discrimination based on national origin" and "the amended complaint d[id] not allege Farris Engineering discriminated against him based on race").

b. **Immigration Status Discrimination**

This leaves Plaintiff's theory that he was subjected to immigration status discrimination. The analysis of that theory is complicated by the fact that Defendants do not differentiate between Plaintiff's Title VII and § 1981 discrimination claims in their motion papers. Instead, in the course of collectively seeking dismissal of both claims, Defendants argue that (1) Plaintiff has not plausibly alleged national origin discrimination and (2) Title VII "does not prohibit discrimination based solely on citizenship or immigration status." (Doc. 9 at 4-7.) Although Defendants are correct on both points, neither speaks to whether Plaintiff may pursue a § 1981 claim based on a theory of

---

origin discrimination against his former employer, Farris Engineering. *Sedighi*, 2025 WL 2879653 at *1. In a October 9, 2025 order screening Plaintiff's complaint, the Nebraska district court held that "[l]iberally construed, Plaintiff allege[d] he is from a foreign country and was successfully performing his job at Farris, but, when he stated he intended to obtain an H1B visa, Farris fired him and withdrew his ability to work elsewhere in the United States," and thus "Plaintiff's allegations show he may have been discriminated against based on his immigration status, but nothing in Title VII makes it illegal to discriminate on the basis of citizenship or alienage." *Id.* at *2 (cleaned up). Plaintiff then amended his complaint against Farris Engineering, which the Nebraska district court again screened. *Sedighi v. Farris Eng'g, Inc.*, 2026 WL 554570, *1 (D. Neb. 2026). Once again, the court concluded that "Plaintiff ha[d] failed to state a claim of national origin discrimination" because "Plaintiff's allegations show he may have been discriminated against based on his immigration status, but nothing in Title VII makes it illegal to discriminate on the basis of citizenship." *Id.* at *5 (cleaned up).

immigration status discrimination. For that reason alone, the Court is wary of dismissing Plaintiff's § 1981 discrimination claim at this juncture.

The Court further notes that, as interpreted by the Ninth Circuit, § 1981 prohibits discrimination based on citizenship status and alienage. *See, e.g.*, *Rajaram v. Meta Platforms, Inc.*, 105 F.4th 1179, 1186 (9th Cir. 2024) ("[T]here has long been a prohibition in section 1981 against at least some forms of discrimination based on citizenship status."); *Sagana v. Tenorio*, 384 F.3d 731, 740 (9th Cir. 2004), as amended (Oct. 18, 2004) ("We hold that § 1981 prohibits governmental discrimination on the basis of alienage."). With that said, it is not obvious that Plaintiff's claim here is properly conceptualized as a claim of "citizenship status" or "alienage" discrimination. Indeed, Plaintiff acknowledges that AEI hires other non-citizens and aliens who, like him, have authorization to work in the United States. Plaintiff's claim is that he was subjected to discrimination because he possessed a different type of work authorization than those other non-citizens and aliens—a CPT rather than an H-1B visa—and characterizes this form of discrimination as "immigration status" discrimination.

The Ninth Circuit has not addressed whether § 1981 prohibits this sort of discrimination and other courts are split on whether it does. *Ruiz v. Zoom Video Commc'ns Inc.*, 2022 WL 770293, *2-4 (W.D. Wash. 2022), *report and recommendation adopted*, 2022 WL 766994 (W.D. Wash. 2022) (canvassing cases). On the one hand, in *Resendiz v. Exxon Mobil Corp.*, 72 F.4th 623 (4th Cir. 2023), the Fourth Circuit rejected a § 1981 claim that is similar to the claim being asserted here. In *Resendiz*, the plaintiff—a citizen of Mexico who illegally entered the United States as a child and later received "deferred deportation and eligibility for temporary work authorization under the Deferred Action for Childhood Arrival program" ("DACA")—applied for an internship at ExxonMobil. *Id.* at 624-25. During the application process, the plaintiff disclosed "that he is not a United States citizen, but erroneously represented that he had permanent work authorization under federal law." *Id.* at 624. "Consistent with a company policy allowing citizens and noncitizens alike to be hired so long as they had permanent work authorization,

ExxonMobil offered De Leon the internship. De Leon accepted. But, when De Leon submitted his paperwork, it showed that he lacked permanent work authorization. So—consistent with its policy—ExxonMobil rescinded its offer." *Id.* The plaintiff sued, asserting a claim of alienage discrimination claim under § 1981, but the district court dismissed that claim and the Fourth Circuit affirmed, emphasizing that the plaintiff "does not allege that the policy blatantly tells aliens that they need not apply. Nor could he, since ExxonMobil extended him an offer despite knowing that he was an alien." *Id.* at 628. The court continued:

> [W]hen an employer imposes a policy that leads to different outcomes between otherwise identical employees based purely on the employees' protected characteristic, we know the employer intentionally discriminates based on that characteristic. . . . An intentional difference in treatment is exactly what De Leon cannot allege. . . . [He] needs to allege that—aside from his protected trait—he is "materially identical" to another employee who is treated differently. De Leon is an alien with temporary work authorization . . . [s]o we would need to change De Leon into a citizen who still possessed only temporary work authorization and then compare outcomes. But we encounter a problem: That category—citizens with temporary work authorization—does not exist. And there is nothing in the complaint suggesting that ExxonMobil would have been willing to hire a citizen if, hypothetically, he did not have permanent work authorization. As a result, De Leon has not plausibly alleged that ExxonMobil tolerates a trait—temporary work authorization—in citizens that it does not in aliens. So he has not alleged facts that, even if accepted as true, establish intentional discrimination . . . .

*Id.* at 629 (cleaned up). The court concluded: "ExxonMobil hired De Leon despite knowing he was an alien. So its policy does not facially screen out all aliens. And ExxonMobil revoked his offer only after learning that he lacked permanent work authorization. Without any indication whether ExxonMobil would also revoke an offer to a citizen who it likewise discovered lacked permanent work authorization, De Leon cannot plausibly allege that ExxonMobil treated him worse than a citizen. Maybe the impact of ExxonMobil's policy requiring permanent work authorization is felt only by aliens. But discriminatory impact alone does not suffice. The discrimination must be intentional." *Id.*

at 629-30. *See also Vaughn v. City of New York*, 2010 WL 2076926, *10 (E.D.N.Y. 2010) (acknowledging that § 1981 "appl[ies] to discrimination on the basis of alienage, *i.e.* non-U.S. citizenship" but emphasizing that "alienage discrimination is discrimination on the basis of citizenship status, not immigrant status" and that "[d]iscrimination on the basis of a person's status as an immigrant to the United States is not alienage discrimination unless it is also motivated by the lack of U.S. citizenship").

On the other hand, *Rodriguez v. Procter & Gamble Co.*, 338 F. Supp. 3d 1283 (S.D. Fla. 2018), also involved a § 1981 claim asserted by a DACA recipient who was rejected for an internship due to a lack of long-term employment authorization. As in *Resendiz*, the defendant in *Rodriguez* argued that the "decision not to hire [plaintiff] was based on his immigration status and not his citizenship. Because the complaint admits that both citizens and non-citizens were invited to apply . . . , at best, then, the Complaint alleges that [the defendant] discriminated against individuals with temporary immigration statuses, a claim that is not cognizable under Section 1981." *Id.* at 1285-86 (cleaned up). But unlike in *Resendiz*, the court rejected that argument, holding that the defendant's "policy, as alleged in the complaint, could be construed to discriminate against a subset of legal aliens, which are a protected class under section 1981. And it is well established that plaintiff need not allege discrimination against the whole class to establish a section 1981 claim. . . . [E]ven if Defendant has lawful business reasons to reject applications from DACA recipients, those reasons cannot be properly determined on a motion to dismiss." *Id.* at 1287. *See also Juarez v. Social Finance, Inc.*, 2021 WL 1375868, *1, *6-7 (N.D. Cal. 2021) (denying motion to dismiss § 1981 claims asserted by two plaintiffs, a DACA recipient and a conditional permanent resident, who alleged that the defendant engaged in alienage discrimination by only accepting loan applications from U.S. citizens, lawful permanent residents, and visa holders, and rejecting the defendant's argument "that it does not discriminate against non-citizens because some non-citizens—namely LPRs and some visa-holders—are still eligible to contract for credit").

As this discussion shows, the question of how § 1981 applies in this circumstance

is unsettled. Given that uncertainty, and because Defendants did not specifically address this issue in their motion papers, the Court will allow Count Two to proceed for now, without prejudice to Defendants' ability to raise a renewed challenge at a future stage of this case (such as through a Rule 12(c) motion). *Cf. Jimenez-Bencebi v. Arizona*, 2024 WL 2923715, *8 (D. Ariz. 2024) ("It was Defendants' burden, as the movants, to explain why L.J.'s claims are subject to dismissal under Rule 12(b)(6) and Defendants have failed to meet that burden.").[11]

II. <u>Count Three</u>

In Count Three, Plaintiff asserts a claim for discrimination based on immigration status in violation of 8 U.S.C. § 1324b. (Doc. 1 at 12-13.)

A. **The Parties' Arguments**

Defendants argue § 1324b "requires that a charge be filed with the IER [Immigrant and Employee Rights section] within 180 days of the alleged violation." (Doc. 9 at 8, citing 8 U.S.C. § 1324b(b)(1), (d)(3)). Defendants further argue that "[a] private complaint may be filed before OCAHO [Office of the Chief Administrative Hearing Office] only if the IER fails to act within 120 days, and then only within 90 days of notice." *Id.* (citing 8 U.S.C. § 1324b(d)(2)). Defendants argue that "[c]ourts routinely dismiss § 1324b claims where plaintiffs fail to allege and establish timely exhaustion" and that "Plaintiff does not allege facts demonstrating compliance with these mandatory prerequisites." (*Id.*)

In response, Plaintiff, "as a matter of good faith and without conceding any deficiency in the pleadings, . . . clarifies that he did, in fact, submit a charge to the [IER] Section of the U.S. Department of Justice alleging violations of 8 U.S.C. § 1324b" and that he "received a written response from IER declining to pursue the charge." (Doc. 21 at 2.) Plaintiff attaches the IER's response as Exhibit B to his brief. (*Id.* at 20.) Plaintiff argues

---

[11] The Court also notes that although Defendants' motion broadly argues that each of Plaintiff's claims "relies on conclusory assertions and fails to allege who did what, when, and how the alleged conduct satisfies the elements of each claim" (Doc. 9 at 9), this challenge is unavailing in relation to the "immigration status" discrimination claim in Count Two. Because that claim is based on allegations that Defendants expressly identified Plaintiff's CPT/immigration status as the basis for the termination decision (Doc. 1 at 10), there is no need to go down the *McDonnell Douglas* path of identifying comparators.

that "[t]his exhibit is consistent with and supports the factual allegations already pled and may properly be considered by the Court in evaluating Defendant's Motion to Dismiss," and he "requests that the [Court] to look at Exhibit B for clarification of exhaustion of the administrative remedies." (*Id.* at 2.) Plaintiff argues that his "submission demonstrates a good-faith effort to invoke administrative remedies" and further argues that "to the extent Defendants challenge exhaustion or statutory coverage, such issues present factual and legal questions not appropriate for resolution at the motion to dismiss stage." (*Id.*) Plaintiff also argues that the "IER declined to accept the charge on procedural and statutory grounds," and thus "the agency's response reflects statutory limitations on IER jurisdiction rather than any failure by Plaintiff to act." (*Id.*) Later, Plaintiff reiterates that "Defendant[s'] exhaustion argument is . . . incorrect" because "Plaintiff has, in fact, pursued and exhausted available administrative remedies, including filing [a] charge[] with . . . the [IER] Section . . . of the Department of Justice," and "[a]t a minimum, these allegations raise factual issues regarding exhaustion that cannot be resolved at the pleading stage." (*Id.* at 9-10.)

In reply, Defendants argue that Exhibit B "does not show exhaustion. It shows the opposite." (Doc. 22 at 4.) Specifically, Defendants argue that Exhibit B "reflects [that] IER did not accept the submission as a charge for investigation" and that the IER's "response states that the submission could not be accepted because it was *untimely* and because, based on the allegations presented, Plaintiff *did not fall within the class protected* against the type of citizenship-status discrimination alleged." (*Id.*) Thus, Defendants argue that "even accepting Plaintiff's exhibit on its face, Plaintiff did not obtain acceptance of a charge and did not cure the statutory deficiencies identified in the Motion." (*Id.*) Next, Defendants argue that "Plaintiff's characterization of IER as merely having 'declined to pursue' the matter is inaccurate" because Exhibit B "states IER *lacked authority to accept the submission as a charge*." (*Id.* at 4-5.) Defendants argue that "[a] 'good faith effort' to submit materials is not the same as satisfying statutory prerequisites," "[n]or does Plaintiff explain how an untimely, unaccepted submission constitutes exhaustion." (*Id.* at 5.)

B. **Analysis**

"Generally, 8 U.S.C. § 1324b prohibits employment discrimination based on national origin or citizenship status." *Lomeli v. Holder*, 2010 WL 11596151, *3 (C.D. Cal. 2010) (citing 8 U.S.C. § 1324b(a)). The Ninth Circuit has held that "[a]lleged violations of § 1324b may be challenged either by the Office of Special Counsel for Immigration Related Unfair Employment Practices ('OSC' [or 'Special Counsel']) or by a private individual in an action brought before the [OCAHO]." *Gen. Dynamics Corp. v. United States*, 49 F.3d 1384, 1385 (9th Cir. 1995) (citing 8 U.S.C. § 1324b(d)). "Before an individual can instigate a private action, however, the claim first must be filed with the OSC." *Id.* (citing 8 U.S.C. § 1324b(b)). "If the OSC fails to file a complaint within 120 days of receiving the claim, the individual making the charge may initiate a private action before the OCAHO." *Id.* (citing 8 U.S.C. § 1324b(d)(2)). "Hearings in § 1324b cases are adjudicated by ALJs [administrative law judges] with the Department of Justice, who are appointed pursuant to the provisions of 5 U.S.C. § 3105." *Lomeli*, 2010 WL 11596151 at *3 (citing 8 U.S.C. § 1324b(e)(1)-(2); 28 C.F.R. § 68.26).

"After an ALJ adjudicates the complaint—whether brought by the Special Counsel or by the aggrieved party—the parties may request review of the ALJ's decision in front of the U.S. court of appeals for the circuit in which the violation is alleged to have occurred." *Zhang v. Nat'l Pub. Radio, Inc.*, 2025 WL 4033858, *12 (D.D.C. 2025).

"The role of federal district courts under § 1324b is limited to two functions." *Lomeli*, 2010 WL 11596151 at *3. "First, a district court may order compliance with a subpoena lawfully issued by an ALJ (and punish contempt of such an order)." *Id.* (citing 8 U.S.C. § 1324b(f)(2)). "Second, a district court may enforce an order of an ALJ upon petition by the Special Counsel or, if the Special Counsel has failed to act, upon petition by the individual filing the charge." *Id.* (citing 8 U.S.C. § 1324b(j)(1)). "In sum, then, § 1324b does not provide for private causes of action in federal court, and implicates judicial review only after administrative procedures have been exhausted." *Id.* (cleaned up). *See also Ravines de Schur v. Easter Seals Goodwill N. Rocky Mountain, Inc.*, 2023

WL 4635890, *4 (10th Cir. 2023) ("[A] federal district court has jurisdiction under 8 U.S.C. § 1324b(j) to enforce an administrative law judge's order under this statute. But the statute does not allow a party to file an original, non-enforcement action in a district court. Thus, the district court was correct to dismiss Ravines de Schur's § 1324b claim because her complaint cannot plausibly state a claim upon which relief can be granted without a valid private right of action."); *Zhang*, 2025 WL 4033858 at *12 ("Section 1324b does not create a private right of action to file actions in federal court.").

Given this backdrop, Plaintiff's claim under § 1324b necessarily fails. "[W]hen the IER section rejected [his] claim, whether on jurisdictional grounds or on the merits, [P]laintiff could nonetheless have filed h[is] claim in front of an ALJ and then appealed to the [Ninth] Circuit had []he not obtained the result []he sought." *Zhang*, 2025 WL 4033858 at *12. Plaintiff's "failure to take the steps prescribed by Congress for enforcing § 1324b precludes adjudication of [his] claims here." *Id. See also Hsiung v. Walt Disney Co.*, 2020 WL 7379145, *7 (C.D. Cal. 2020) (granting summary judgment on § 1324b claim where plaintiff failed to administratively exhaust claim). As noted, "the role of the federal district courts under § 1324b is limited to two functions . . . both of which are inapplicable here—neither a subpoena issued by an ALJ nor an ALJ order are at issue in this case." *Roseman v. Walmart, Inc.*, 2024 WL 5439280, *4 (C.D. Cal. 2024) (cleaned up). Accordingly, Plaintiff's § 1324b claim must be dismissed.[12]

III. Count Four

In Count Four, Plaintiff asserts a wrongful termination claim under A.R.S. § 23-1501 (the "Arizona Employment Protection Act" or "AEPA") based on a violation of Arizona public policy. (Doc. 1 at 3, 13.)

A. **The Parties' Arguments**

Defendants argue that "[t]he AEPA provides the exclusive remedy for wrongful termination claims in Arizona and strictly limits actionable claims to specific categories:

---

[12] This conclusion renders it unnecessary to address Defendants' other grounds for seeking dismissal of Plaintiff's § 1324b claim.

(1) breach of a qualifying employment contract, (2) termination in violation of an Arizona statute or the Arizona Constitution, or (3) retaliation for protected whistleblowing or refusal to violate Arizona law." (Doc. 9 at 8.) Defendants argue that "Plaintiff does not allege the existence of a qualifying employment contract, nor does he identify any Arizona statute or constitutional provision allegedly violated." (*Id.*) Defendants also argue that "[a]llegations premised on federal law or federal public policy do not support an AEPA claim." (*Id.* at 8-9.) Last, Defendants argue that "[w]here the underlying statute provides its own remedial scheme, the AEPA's exclusivity provision bars duplicative wrongful termination claims," so "Plaintiff's AEPA claim . . . fails as a matter of law." (*Id.* at 9.)

In response, Plaintiff argues that Defendants' argument "is premature and overly narrow." (Doc. 21 at 10.) Plaintiff argues that he "has alleged facts demonstrating that his termination was not based on legitimate business reasons, but rather on improper and unlawful considerations, including discrimination and misapplication of work authorization requirements." (*Id.*) Plaintiff argues that "[t]hese allegations fall within recognized exceptions under A.R.S. § 23-1501, including termination in violation of public policy and statutory exceptions." (*Id.*, citing A.R.S. § 23-1501(A)(3)(b)). Next, Plaintiff argues that "Defendant[s'] assertion that Plaintiff has failed to identify a qualifying statute or legal basis ignores that Plaintiff's claims are grounded in violations of federal anti-discrimination laws, which inform and support Arizona's public policy against unlawful employment practices." (*Id.*) Plaintiff argues that "[a]t the pleading stage, [he] is not required to exhaustively identify every statutory provision but must allege sufficient facts to support a plausible claim." (*Id.* at 11.)

In reply, Defendants argue that Plaintiff's response "fails to cure the AEPA claim." (Doc. 22 at 6.) Defendants reiterate that "Plaintiff d[oes] not identify a qualifying contractual basis or a properly pleaded statutory/public-policy predicate sufficient to state an AEPA claim" and that "AEPA does not permit a duplicative wrongful-termination claim where the underlying statute provides its own remedial framework." (*Id.*) Defendants argue that "Plaintiff responds at a high level by invoking public policy and anti-

discrimination principles, but that does not answer the specific defect." (*Id.* at 7.) Defendants also argue that "[a] generalized appeal to public policy does not create a standalone AEPA claim where the allegedly violated statutes already provide their own cause of action and remedial schemes," "[n]or does Plaintiff identify facts bringing his termination claim within a recognized AEPA pathway independent of those federal statutes." (*Id.*)

B. **Analysis**

Under A.R.S. § 23-1501(A)(3)(b),[13] "[a]n employee has a claim against an employer for termination of employment only if . . . [t]he employer has terminated the employment relationship of an employee in violation of a statute of this state." *Id.* "All definitions and restrictions contained in the statute also apply to any civil action based on a violation of the public policy arising out of the statute." *Id.*

Plaintiff's theory—that his "claims are grounded in violations of federal anti-discrimination laws, which inform and support Arizona's public policy against unlawful employment practices" (Doc. 21 at 10)—is the same theory that was rejected by the Arizona Court of Appeals in *Galati v. Am. W. Airlines, Inc.*, 69 P.3d 1011 (Ariz. Ct. App. 2003). In *Galati*, the plaintiff "contend[ed] that the Arizona Legislature must have intended that Arizona public policy incorporate federal law, although he admit[ted] that the face of the AEPA appears to contemplate only the body of law promulgated under state legislative authority." 69 P.3d at 1013. The question before the court was "whether violations of federal regulations are necessarily violations of Arizona public policy under the AEPA." *Id.* The court held that "the express and unequivocal language of the statute" makes clear "that it is against violations of the Arizona Constitution and Arizona statutes that protection is provided." *Id.* at 1014. Accordingly, Plaintiff may not assert an AEPA claim under the theory that Defendants' conduct violated federal law that is incorporated into Arizona public policy.

---

[13] Plaintiff's response brief clarifies that he is bringing his AEPA claim under A.R.S. § 23-1501(A)(3)(b). (Doc. 21 at 10.)

IV. Yanke

A. **The Parties' Arguments**

Defendants argue that "[a]ll claims against Defendant Steve Yanke should be dismissed with prejudice" because "Title VII does not permit individual liability against supervisors or employees." (Doc. 9 at 9.) Similarly, Defendants argue that "neither 8 U.S.C. § 1324b nor the [AEPA] provides for individual liability." (*Id.*) Thus, Defendants argue that the complaint "fails to allege any facts that would support a claim against Mr. Yanke in his individual capacity." (*Id.*)

In response, Plaintiff argues that "Defendant[s'] request to dismiss claims against Steve Yanke[] is premature." (Doc. 21 at 12.) Plaintiff argues that the complaint's "allegations concern Mr. Yanke[]'s direct involvement in the challenged employment decisions and discriminatory conduct," and that "[a]t the pleading stage, the Court must accept these allegations as true and draw all reasonable inferences in Plaintiff's favor." (*Id.*) Plaintiff argues that "[w]here a complaint alleges personal participation in unlawful conduct, dismissal at the pleading stage is improper." (*Id.*)

In reply, Defendants argue that Plaintiff's response "does not address Defendants' legal argument that the statutes invoked do not permit individual liability." (Doc 22 at 6.) Defendants argue that "[c]ourts in this Circuit routinely treat a party's failure to respond to an argument as a concession of that point." (*Id.* at 6.) "Because Plaintiff does not meaningfully respond," Defendants argue that their "individual-liability argument is unrebutted and warrants dismissal of all claims against Mr. Yanke." (*Id.*) Defendants reiterate that "[p]ersonal involvement is not enough where the statute does not authorize individual liability" and that "Plaintiff cites no authority showing that Title VII, 8 U.S.C. § 1324b, or AEPA permits the individual-capacity claims asserted here against Mr. Yanke." (*Id.*)

B. **Analysis**

Plaintiff may not assert a Title VII claim against Yanke in his individual capacity. *See, e.g.*, *Pink v. Modoc Indian Health Project, Inc.*, 157 F.3d 1185, 1189 (9th Cir. 1998)

("[C]ivil liability for employment discrimination does not extend to individual agents of the employer who committed the violations, even if that agent is a supervisory employee."); *Ruggles*, 2025 WL 1745023 at *9 ("[T]he Ninth Circuit has long held that Title VII does not provide a separate cause of action against supervisors or co-workers.") (cleaned up).

Plaintiff may, however, assert a § 1981 claim against Yanke as an individual who was personally involved in Plaintiff's termination. *See, e.g.*, *Sharifi Takieh v. Banner Health*, 515 F. Supp. 3d 1026, 1048 (D. Ariz. 2021), *aff'd*, 2022 WL 474170 (9th Cir. 2022) ("A claim for individual liability under § 1981 requires some affirmative link to causally connect the actor with the discriminatory action. A claim alleging individual liability under § 1981 must therefore be predicated on the actor's personal involvement in the adverse decision."); *Elmatboly v. Arizona State Univ. (ASU)*, 2009 WL 10674070, *5 (D. Ariz. 2009) ("Although the Ninth Circuit has never addressed whether individual liability exists under § 1981, several other circuits have expressly held that such liability exists. . . . [G]iven the weight of authority that exists, the court now concludes that there is individual liability under § 1981."); *Leiland v. City & Cnty. of San Francisco*, 576 F. Supp. 2d 1079, 1089 (N.D. Cal. 2008) ("[T]he individual defendants . . . may be individually liable under sections 1983 and 1981, but no individual liability attaches under Title VII.") (footnote omitted).

Defendants also argue that the AEPA does not provide for individual liability. Defendants are incorrect. *See, e.g.*, *Castaneda v. Debra's Way Prods. LLC*, 2026 WL 2426914, *5 (D. Ariz. 2026) ("[S]upervisors are liable under the AEPA for their own tortious conduct."); *Wood v. Maricopa Cnty. Special Health Care Dist.*, 2016 WL 11652335, *2 (D. Ariz. 2016) ("The Arizona Court of Appeals has held that a supervisor could be liable in a case where the company has invested its supervisors with day-to-day control over the company, including the right to fire, and the supervisor has in fact exercised such control to harm another. Those individuals who have the authority to fire an employee and who do so in a manner that constitutes wrongful termination may be held personally liable for such actions.") (cleaned up, citing *Higgins v. Assman Elecs., Inc.*, 173

P.3d 453, 458 (Ariz. Ct. App. 2007)).[14]

V. Leave To Amend

Leave to amend is governed by Rule 15(a) of the Federal Rules of Civil Procedure, which "advises the court that leave shall be freely given when justice so requires." *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (cleaned up). "This policy is to be applied with extreme liberality." *Id.* (cleaned up). Thus, leave to amend should be granted unless "the amendment: (1) prejudices the opposing party; (2) is sought in bad faith; (3) produces an undue delay in litigation; or (4) is futile." *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006). Additionally, "[a] district court should not dismiss a pro se complaint without leave to amend unless it is absolutely clear that the deficiencies of the complaint could not be cured by amendment." *Akhtar v. Mesa*, 698 F.3d 1202, 1212 (9th Cir. 2012) (cleaned up). "[B]efore dismissing a pro se complaint the district court must provide the litigant with notice of the deficiencies in his complaint in order to ensure that the litigant uses the opportunity to amend effectively." *Ferdik v. Bonzelet*, 963 F.2d 1258, 1261 (9th Cir. 1992), as amended (May 22, 1992).

As for Count One (Title VII discrimination), to the extent that claim is based on national origin discrimination, the Court will grant leave to amend should Plaintiff wish to attempt to rectify the issues identified in this order. But to the extent that claim is based on citizenship/alienage/immigration status discrimination, leave to amend is denied as futile. Additionally, should Plaintiff choose to amend Count One, he may not reassert it against Yanke, as such amendment would be futile.

As for Count Three (§ 1324b), that claim is dismissed without leave to amend because amendment would be futile. *Roseman*, 2024 WL 5439280 at *4 ("Because § 1324b does not provide Plaintiff with a private right of action for violation of the statute, Plaintiff cannot possibly cure the defects in his fourth and sixth causes of action. Therefore,

---

[14] Because Plaintiff's § 1324b claim is being dismissed without leave to amend, it is unnecessary to determine whether Plaintiff may reassert that claim against Yanke.

the Court GRANTS Defendant's Motion and dismisses the fourth and sixth causes of action without leave to amend.") (emphasis omitted).

As for Count Four (AEPA), the Court will grant leave to amend should Plaintiff wish to attempt to identify the Arizona statute(s) under which he brings his public-policy claim. Any such amended claim may be asserted against both AEI and Yanke.

Accordingly,

**IT IS ORDERED** that:

1. Defendant's motion to dismiss (Doc. 9) is **granted in part and denied in part**.

2. Within 14 days of the issuance of this order, Plaintiff may file a First Amended Complaint ("FAC"). The changes shall be limited as outlined above. Plaintiff shall, consistent with LRCiv 15.1, attach, as an exhibit, a redlined version of the pleading showing any changes that were made.

Dated this 11th day of September, 2026.

Dominic W. Lanza
United States District Judge